May it please the Court, my name is David Abney, representing the appellants. My heart sank a little bit when I heard you were all three former prosecutors, and then I realized that was pretty foolish on my part, because you have been the proponents and opponents of photographic evidence, motion pictures, videotapes, and videos, and you know better than anybody else that the evidence doesn't just speak for itself. It has to be interpreted. And here the point is, that's one of our basic points, who gets to interpret it, it would be the jury when reasonable people can differ about what the evidence shows. And here I submit to you that reasonable people could differ about crucial points in that videotape as to exactly what it's showing. If we go forward to the eight minute and seven second mark or so in the video, and just before that, we have Dylan getting up from being tasered and then stumbling forward, but where is he going? Is he trying to edge around the wall to his right? Is he heading toward the police officer? Does he even know where he's going at that point? Reasonable jurors could say, well, he could be trying to attack the police officer. He was tasered after he pulled out a knife, right? He was tasered after he pulled out the knife, Your Honor. When he got up from the tasering, still had the knife. He did have the knife in his hand, Your Honor. But what he was going to do with that knife and what a reasonable police officer should have done under the circumstances is something you really have to take a lot of time to figure out. That means really it's the fact finder has to look at that video, has to play that video over and over, has to play it at regular speed, at slow speeds, frame after frame, whatever they need to do to make sure that they understand it. My colleague across the aisle says, well, that's unfair to the police officer because he doesn't have the time to look at things in slow motion. And we're not looking at this in hindsight. What we're trying to do is have the trier of fact reconstruct as well as possible what a reasonable police officer should have been perceiving. And it take a lot of effort. It would probably also take a video expert to try to improve the video so that it is closer to reality. But you may have noticed when you were seeing the video that it's one of those fisheye lenses. So it's a little bit distorted at the edges. Counsel, let me ask you this. The Supreme Court in recent years has made your job a lot harder when it comes to qualified immunity. And there is a case that I know the opposing counsel is going to raise with us. I want to give you an opportunity to talk about it. I did not see it cited in your briefs. It's this case called Casella, which is a Supreme Court case where our Ninth Circuit was reversed in a case in which someone was holding a knife and an officer shot the person when the knife holder stepped forward. That seems to me a very bad case for your side. And so I want to hear from you because we have to write something in this case. We have to write something to explain why we think you're right or why we think you're wrong. And we've got to deal with the Supreme Court precedent. So help us understand why Casella is not the bad case for you that I can guarantee opposing counsel says it is. Well, it's a miserable case. But the difference here is that we have a video. We can actually see what is going on. And the jury can see what's going on and try to understand exactly what a reasonable police officer should have been perceiving, what a reasonable police officer should have been doing under those circumstances. It's certainly important that this young man is moving forward with a knife in his hand. But here we have an opportunity to try to reconstruct those events and take an unbiased view of what the police officer was doing. When he got up from the tasing, knife still in hand, I take it it's your argument that he may not have been going towards the officer who fired the rounds, correct? Yes, Your Honor. That he may have been going to turn the corner? Yes, Your Honor. Wasn't there a police officer there? No, Your Honor. Also? The Bailey, Officer Bailey, the perspective is from Officer Bailey's video camera. She's the one who tasered him. So she's looking forward. No, I'm talking about the officer that ultimately came over, stepped on this individual's hand and took the knife away. No, he was just before he got to the scene and he's off to the left. He's behind Officer Fernandez-Cafate. So he's not an actor in this at all at this point. It's just the two of the police officers and the video. Counsel, let's say we disagreed with the district court's finding that everything that was done was reasonable, but upheld the district court's qualified immunity finding by saying that there's no case that would put the officers on notice that their conduct violated the constitutional rights of Mr. Liberty. So let's say we had an alternate ground for upholding qualified immunity, but we didn't uphold the district court's finding that everything was 12-611, the wrongful death statute. What would you point to as either the wrongful act, neglect, or default that caused Mr. Liberty's death? I'm glad we're shifting a bit into state law because if I had been in charge of this case in the beginning, we'd have never put a federal claim in because you get the qualified immunity defense and it gets very confusing and very narrow. But looking at state law, the first point would actually be at six minutes and seven seconds when Officer Bailey, out of the blue, grabs a hold of Dillon in a violent way to force him to sit down. Officer Fernandez-Gafati jumps into that. And you can look at the video, the look of pure terror and misunderstanding on the part of Dillon. That is where things went bad. Well, the Arizona Supreme Court in Ryan has told us definitively that that intentional use of force can't be neglect, that that can't be negligence. So you're left with wrongful act or default, as I read the Arizona wrongful death statute and as I read the Ryan opinion. So what would you point to as the wrongful act or default that could have been responsible for the death of your client that would allow for liability under the Arizona wrongful death statute? Okay. The initial one is the six minute and seven second start that kicks off everything. And the Ryan versus Napier, I did an amicus brief for the Travelers Association and I had several discussions with the plaintiff's lawyer, why in the world didn't you simply allege battery? And in fact, at the opinion, it says on page 62 of the reporter, the only claim supported by the facts here is an intentional battery which McDonald deliberately neither pled nor tried to the jury. And they would never, they had some sort of theory going that they had to do negligence. I never figured out why. It's really, it's the intentional tort here is what leads to the wrongful death. Okay. And what specific intentional tort or torts? Assault, battery, wrongful arrest. Okay. And were those advanced by you to the district court in opposing the motion for summary judgment? Did your papers to the district court point out that either of those or any of those three things, those three intentional torts that you've identified just now were reasons the district court shouldn't grant summary judgment on the wrongful death claim? Yes, Your Honor. The argument was made that under state law, there were, there are still existing causes of action no matter what happened in federal court. I understand that. Did you argue to the district court that any of those three intentional torts, did you use those words, either false arrest or battery or the third one that you mentioned, that those were reasons why the wrongful death claim survived and the district court should not grant summary judgment to the defendants? No. The lawyer was not that specific, but he did say under state law, we do have a cause of action and it stands on reasonableness. Did you use any of those three intentional tort descriptions by name in your opening brief to us? I, I talked about the wrongful death statute. Right, but did you talk about assault, battery, false arrest by name in your opening brief? Yes, Your Honor, I believe I did. And if I didn't, I was, it's subsumed under the wrongful death act. I know we talked about it in detail in the reply brief, but I believe I did in the opening brief as well. And that's the point here is under state law, we have a situation where, as in the Menendez case, there comes a point where the police officers have done something that kicks off the final result, that it's the proximate cause. And under Arizona law, all you have to do is contribute just a little bit to that final result. Dillon's behavior comes in as a comparative fault kind of defense in Arizona. You can have the comparative fault, in fact, you're required to compare the fault of all parties that are involved in an event like this, even if they are committing an intentional wrong. And they're saying, of course, Dillon was committing an intentional wrong by supposedly attacking the police officer. So under state law, yes, there is, there are claims that need to go forward. Under simple wrongful death theory, there is a claim that needs to go forward because you have these events starting off at six minutes and seven seconds that just, well, two minutes later result in a fatal shooting. And if those events at six minutes and seven seconds had not happened, a reasonable juror, reasonable jurist could say there would have been no wrongful death. And that, that is the crucial part of the case. The other part of the case, of course, is what happened at the end, but that, you know, that's a subject for debate. Why the police officers grabbed Dillon is another mystery to me. They repeatedly said to him, sit down, sit down, sit down. But he's a citizen, he's allowed to stand if he wants to stand. Who wants to sit on a hot pavement on a Scottsdale summer? Nobody. He didn't tell us why he didn't want to stand, and most people didn't want to stand with the police officers and sat down. But the first six minutes and six seconds of this encounter are extremely important for what they tell us about the credibility of the police officers and about Dillon himself. He's clearly under the weather. He's clearly a little bit distracted. He's clearly a little worse for wear. The toxicology report showed substantial use of methamphetamine, right? It shows that there was a large, I think the wording was a large amount of amphetamine, methamphetamine, in his system. But there was no expert testimony at all that said with this level of metabolite at any particular point in the past, he would have been acting under the influence of that drug to the effect that it would make him wild and uncontrollable. There was a huge change in his affect, though, after the first six minutes and six seconds and then the attack and after the attack. It's night and day. And if you ever find a case where somebody has been scared out of their wits, they have scared this young man out of his wits. And he's not reacting well. He's at the end, he's pacing, he's upset, he's angry, he pulls out a knife with the stupidest thing anybody could possibly do. And what is he going to do with that? I mean, he is gone. And it all started off at six minutes and seven seconds. And I've got about less than that, so I'd like to reserve my Got it. May it please the Court, Laurie Davis, and I represent the City of Scottsdale, Officer Fernandez-Cafati and Officer Bailey in this action. From the officer's perspective, that's what this Court is charged with analyzing. The facts, as known by the officer, corroborated the belief of the officer and through the officer's perspective. Well, that's what we're charged with looking at in part on qualified immunity. That's correct. Not on the state law claims. Correct, Your Honor. And on the state law claims, it would be the reasonableness of the actions and under the justification statutes. In the light most favorable to the non-moving party, assuming that those were, well, I'm sorry, on justification, et cetera, the district court never ruled on that. The district court found that no reasonable jury could differ, that the conduct of the officers was reasonable. And at the hearing, the transcript reads a little strange, but if you look at the context of the conversation that was going on at the time, the court was speaking in terms of a reasonableness analysis and qualified immunity, which I think was the clearly established, but was using that kind of synonymously with clearly established. Well, counsel, I obviously wasn't there, and I have the transcript, and I don't see anything in the transcript that could be reasonably interpreted as plaintiff's counsel saying if we lose on qualified immunity, we lose. Plaintiff's counsel said the state law claims, I think they'd survive on a reasonableness theory. So the district court said, no, no, everybody agreed that if you lose on reasonableness, you lose on everything. I just don't see that. It was in context. I'm not here to argue the transcript. And you didn't in your brief. Yeah, and I agree that the transcript does not read well for that, but I also will agree with the court that that was the flavor of the conversation at the time, but when it was translated, it didn't come out that way. Irrespective, it doesn't matter. If we're looking at the state law claims, the only state law claims raised in their complaint are negligence and wrongful death based upon that negligence, and you keyed right in on that, Judge Bennett, when you were talking about the assault and battery claims were not raised in the opening brief. They certainly were not, even if they were. And the one thing that is in the complaint, there are some descriptive terms of assault and battered. And false arrest. And false arrest, sure. But the claims themselves were left out. The original complaint had an assault and battery claim. The amended complaint left that out. We have the initial disclosures under the mandatory initial disclosure project that also asked the plaintiffs to I think there's a little bit of backpedaling going on, trying and wishful thinking, hoping that there was some assault and battery claims raised. Irrespective of that, the assault and battery claims would go away as well because it was a justified touching. Let me ask you the same question I asked your colleague. If we were to uphold the qualified immunity finding, not on the ground that the actions were clearly objectively reasonable, but on the ground that there's no case that would have told the officers that they were violating the plaintiff's constitutional rights, why, if we were to make that finding, what is your argument as to wrongful death based on a wrongful act under 12-611 that we should affirm the district court's findings since the district court went on a different prong of the qualified immunity analysis? Well, I think the analysis as to whether or not the officer's conduct is justified or not is remarkably similar to a reasonableness analysis. And I think the court extensively went through from the moment of detention through each use of force that the officer's actions were reasonable. I think perhaps another finding, if your honors felt it were necessary to remand it for another finding specifically, that it would be reasonable and justified under 13-409 and 13-410. But I think that it's kind of an exercise in futility because we have a negligence claim that cannot go forward under Ryan v. Napier or Spooner. But Ryan doesn't bar the wrongful death claim. Ryan would bar the negligence that the wrongful death claim is based upon because when we look at the conduct that they're accusing of on wrongful death, it is the firing of the weapon, which is an intentional act. Well, but Ryan, it strikes me, leaves open the possibility that if, for example, the wrongful act which causes the death of a person is, say, false arrest in a proximate cause sense. And I'm not saying that this is a finding that would be made, but if the district court were to say there was a false arrest and that could have proximately caused the death because it set in line the, set in motion the events which ultimately led to this tragic shooting, why wouldn't that be possible under Ryan? Well, first of all, that's not the facts that we have here. The district court did not find that there was a false arrest. No, I understand that. I understand that. Okay. And But if we were to say there were facts which could justify a claim of false arrest and that that could be found by a trier of fact to approximately cause Mr. Liberty's death, why would that be barred simply because we upheld the district court on the federal claims based on no case giving guidance to the officer at a specific enough level? Judge Bennett, I'm not sure I'm following you with this because we don't have a false arrest situation in this case, and I think that that is also an intentional act that would be barred under Napier. I don't see how that that The, as I read the wrongful death statute, when the death of a person is caused by wrongful act, neglect, or default, and so you can have a wrongful death claim based on other than negligence in Arizona, correct? You can, but that's the only part of the claim that they raised. That's the only thing that's in their amended complaint. So I don't think factual allegations that the stop of Mr. Liberty was without either reasonable suspicion or probable cause. I mean, they make those, there are those statements in the complaint, in the operative complaint. I mean, specifically paragraph 61. But, Your Honors, the point here is that we're not on a motion to dismiss. We're on a motion for summary judgment, and at that point, all the evidence has come forward, and at that point, we don't have a false arrest situation. We have reasonable suspicion. We have probable cause. So tell me why you have reasonable suspicion of criminal activity afoot that would justify absolutely the physical force used, what your colleague said, trying to force Mr. Liberty to sit down. So that would be, with regard to the detention itself, the officers had reasonable suspicion that Mr. Liberty was certainly not well. They believed him to be under the influence of which, in toxicology, was proved to be true that he was on methamphetamine. His aunt also confirmed that day that she knew he was on meth and was as high as she's ever seen him. Other people saw what these officers saw that corroborates their perception that he was jittery, he was pale, he looked like a drug tweaker. There are many things, many other people corroborated. So at this point, we have a two-pronged stop. We have a Terry stop, and we have a community caretaking stop at this point, which the officers had reasonable suspicion for both under that point for the 911 call. Okay, so let's assume I agree with you that there was enough there under Terry and the community caretaker doctrine to stop Mr. Liberty and to ask him questions. What was there that justified the use of force to make him sit down? I mean, I looked at the video, and it seemed to me that, in general, he was answering the officers' questions. He gave his name, he gave his address. There was a little confusion. It looked to me like the officers thought he was giving a false name when he said his last name was Liberty. But what was there that justified the use of force to make him sit down? Clearly, Your Honor, the officers were exceedingly patient with Mr. Liberty, giving him six minutes where they tried to engage him in conversation, which progressed into giving commands, because he was making them more and more concerned for their safety and for the safety of others. Because this was a busy shopping center right after 5 o'clock. There are people coming and going from Sprout, so they're becoming concerned. And Graham tells us that an officer is allowed to use a reasonable amount of force in an investigatory stop. And I can't imagine anything more reasonable than placing your hand on another person's arm. She didn't punch him. She didn't tase him. She didn't do anything at that point other than say, sit down. And when he pulled away, he risked it. He escalated the situation by resisting. And so everything went up from there. And the officers, to their credit, were progressively using everything they could to the least degree that they could at the time. They were responding to a person in distress call, correct? They were responding to both a 911 hang-up call, which became a welfare check, yes. And when Officer Fernandez-Cafati got on scene, a patron flagged him down and said, I know who you're looking at. He's been pacing in front of Sprouts. He looks weird. Something's wrong with him. And so that's what got their antenna up and further laying eyes on him to see, yeah, this guy's not well right now. And so that's part of their community caretaking function, that they are concerned about his health. And that's very clear, I think, from the on-body camera, very clear. They're concerned about his health. They're concerned about the safety of other people. And so that's what they were doing at that moment to detain him. And when he refused to sit down voluntarily, after 22 times that he was told to do so, the officer said, all right, you're moving around too much. I need you to sit down now. The other important thing I want to make sure that, because I see my time is starting to dwindle away, I want to make sure I do cover something. The only thing that Plaintiff's Counsel has brought up with regard to there being a difference in crucial points in viewing the video is the idea that he wasn't running toward the officer. He was running away. And that's the only thing that I've been able to identify from their briefing as well, to see that that's the one crucial point that a jury needs to consider. So I think Your Honors need to consider that. Number one, in the hearing below, Plaintiff's Counsel admitted that he was carrying a knife, that he was running in the direction of Officer Fernandez-Cafati, who, by the way, was the officer with the gun pointed right at him. So in less than two seconds' time, he gets to his feet, he runs with the knife towards Officer Fernandez-Cafati in the direction of what they've admitted to. Was it reasonable for Officer Fernandez-Cafati to believe, as he stated he did, that his life was in danger? Was it reasonable for him to believe that? Was it reasonable, then, for him to have believed, a reasonable police officer, to have believed that had he taken that right turn around the wall there, that other people's lives would be in immediate danger? A busy parking lot, a busy center. We have several eyewitnesses to the shooting. There were people there. Would it be reasonable for an objective officer to have believed that that was a danger? And if Officer Fernandez-Cafati was wrong, that he wasn't headed toward him, isn't that a reasonable mistake of fact? And I think the courts, the United States Supreme Court and Casella, as well as Sheehan, are instructive to this court that this court should find this conduct reasonable. We have erratic behavior. We have disobeying commands. We have a deadly weapon. And we have mere seconds to assess the danger and the action that's necessary. And I think at every step of the way, from the detention to the application of force, to the pursuit, to the taser, to the deadly force, officers responded as reasonable, objective officers would respond. Now, I want to respond to a couple other things very quickly since I don't have a lot of time. The idea that, and I think I pointed this out in the motion regarding the video clips, the idea that a jury needs to study this video and they need to watch it over and over and put it in slow motion and freeze frame, that's exactly what the officers don't have the luxury to do. In this moment, they had to react. And that's what Graham tells us. Graham tells us that in circumstances that are tense, uncertain, and rapidly evolving, these officers have to make that decision like that. And if they're wrong, they could lose their life. They could become seriously injured. And under Tennessee v. Garner, I think it's very clear, we had probable cause at this point to believe that he was an imminent threat to life and bodily injury if he were to go. At which point? I'm sorry? At which point? At the point that the officer fired his weapon, which is the operative point that the court must look at the moment that the weapon is fired. And at that point, and if you watch the video, Officer Fernandez-Cafati takes two or three steps back almost tripping on a bush. Had he not done that, when you watch the video over and over again in slow-mo with your clerks, you will see that Mr. Liberty crossed over where the officer was standing. Reid v. Hoy tells officers they don't have a duty to retreat, but it's very clear that this officer did not want to have to resort to deadly force. He was compassionate with this man from the beginning of this stop. He wanted to get him help. And unfortunately, Mr. Liberty escalated the situation to a point that the officer had no choice but to fire his duty weapon. So we believe that under the totality of the circumstances taken from the perceptive of the reasonable officer on the scene, from an objective standpoint, everything these officers did was reasonable. The deceased did threaten to cut his own throat, correct? He didn't just threaten, Your Honor. He cut it. And you can see it on the videotape when he falls down. And the plaintiffs admit he was not completely immobilized by the taser. Either the barbs come out or he pulls them out. After he pulls them out, he begins to slice at his throat and says, kill me, shoot me in the head, something to that effect, gets up and runs at the officer. And after the officer fires again on the ground, he begins slicing at his neck. And on autopsy, six slice incisions in his neck and one gash that's an inch and a half deep. And thank God we have the on-body camera video regarding this event, because originally plaintiffs said we planted the knife on him and it was just a stick. And once they were able to look at Officer Maldonado's video, it was conclusively shown through that video we have an actual knife, and this was deadly force that was justified. Thank you very much, Counsel. Thank you. My colleague, Grossel, talks about the luxury of being able to look at the video. And actually I think it's more of a duty for the trier of fact to look at that video to try to figure out what happened. Certainly the police officers at the scene are not seeing things in slow motion. They're not having the opportunity to replay the events before they act. But the trier of fact has got to figure out what happened. And the only objective witness we have is that video. We have the subjective police officers talking about what they did and what they perceived. They talk about, well, he was trying to circle us before we grabbed him. He was trying to edge into our space. And Officer Bailey at one point said, well, we got him to sit down because we weren't sure why he was running away from us. So the video rebuts many of the things that the police officers put in their subjective reports. But more important, it establishes wrongful acts that approximately resulted in a wrongful death. At six minutes and seven seconds, the police officers attacked this young man. They did not have the provocation to do that. They can tell him to sit down if they want, but he doesn't have to sit down if he doesn't want, and he chose not to. And you can see from the first six minutes he was contained, he was quiet, he answered the questions that they gave him to the best of his ability. When they didn't understand his name, he spelled it for them. He gave his correct date of birth, 92. The officer wrote down 93. You can see it right on the video. And when she got that wrong, he corrected it for her. He was doing everything possible to be polite in this contact with the police. The one thing he didn't do, he didn't want to sit down. And so at the six minute, seven mark, he gets grabbed. And this is not, Officer Bailey tried to portray this in a report as just a moderate, mild contact. Do you have a position on the clearly established prong? Clearly established prong of the qualified immunity analysis? I think it's clearly established that police officers don't have the right to shoot people unless they reasonably believe that they're endangered. How could that not be reasonably established? By all the cases that have gone forward, Graham v. Conner and all the others say the same sort of thing. So any police officer should have known, we would submit, that it was unreasonable to shoot. Now, a reasonable juror could look at this and say, oh, you're full of baloney, Mr. Abbey. No, what we see is a police officer acting completely reasonably and doing what he does. But surely, I would think it would be hard to find jurors who would say that grabbing Dylan at the six minute, seven mark, that started off down this path of proximate cause that led to his death two minutes later is what the key event was. And it would qualify under the general rubric of wrongful acts. This is not a negligent kind of death. This is not, oops, I pulled out the pistol instead of the taser and started shooting. No, the officer, Fernando Scafatti, meant to shoot, and I suppose he meant to shoot to kill, and he did it. But he wouldn't have had that necessity if they had treated this young man correctly. Thank you very much, Your Honors. Thank you very much. Thank you to both counsel for your argument in briefing this case. And I want to thank the audience for being patient as this case was obviously the one you were here for, not for the swimming pool case. And I appreciate your patience that we called you last. So thank you very much, everyone. This particular panel is done for the week. I want to thank Judge Hawkins, and Judge Bennett and I will be back tomorrow. Thank you.
judges: Hawkins, Owens, Bennett